**[Cite as *Wyatt v. Springfield*, 2024-Ohio-3334.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| CARTHAGENIA WYATT INDIVIDUALLY AS ADMINISTRATOR OF THE ESTATE OF DELTINA GRAVES | : : : : | C.A. No. 2024-CA-3 |
| | : | Trial Court Case No. 22CV0289 |
| Appellants | : | |
| | : | (Civil Appeal from Common Pleas |
| v. | : | Court) |
| | : | |
| CITY OF SPRINGFIELD OHIO, ET AL. | : | |
| | : | |
| Appellees | | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 30, 2024

. . . . . . . . . . .

ROBERT L. GRESHAM, Attorney for Appellant

KAITLIN L. MADIGAN, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Carthagenia Wyatt appeals, individually and as administrator of the estate of Deltina Graves, from an adverse summary-judgment ruling on a complaint alleging

wrongful death and other causes of action against the City of Springfield and two emergency medical technicians (EMTs). The appellants also include four individuals who were the decedent's next of kin.

{¶ 2} The appellants advance five assignments of error. First, they contend summary judgment was improper because the record contained evidence rebutting a coroner's cause-of-death determination. Second, they challenge the trial court's determination that the appellees were entitled to statutory immunity. Third, they claim the record revealed a genuine issue of material fact as to whether the EMTs engaged in willful, wanton, or malicious misconduct. Fourth, they challenge the trial court's denial of their motion for leave to file expert disclosures. Fifth, they argue that the trial court erred in denying them leave to file a supplemental memorandum opposing summary judgment.

{¶ 3} We find the trial court's immunity determination to be dispositive of this appeal. The trial court correctly found the appellees—two EMTs and the City of Springfield—immune from liability because the EMTs did not engage in willful or wanton misconduct as a matter of law. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 4} The present appeal stems from the death of Deltina Graves. The appellants contend she died at a local hospital as a result of being "dropped on her head" during a medical transport by Springfield EMTs Scott Kaufman and Cory Scanlan. Following the incident, the appellants filed a complaint against the EMTs and the City of Springfield alleging wrongful death and nine other tort causes of action. Following some discovery, the appellees moved for summary judgment arguing, among other things, that they were

entitled to statutory immunity. The trial court sustained the motion for several reasons. First, it found no evidence to rebut a coroner's determination that Graves' cause of death was an "acute atraumatic intracranial hemorrhage," meaning that the hemorrhage was not caused by any head trauma. Second, it reasoned that the EMTs and the City of Springfield statutorily were immune from liability. Third, if found that wrongful-death and survivorship claims needed to be brought in the name of the decedent's personal representative and that any such individual claims failed for lack of standing. Fourth, it concluded that the facts did not support emotional-distress claims. Fifth, it found no evidence of willful, wanton, or malicious misconduct by the EMTs. This appeal followed.

## II. Immunity and Willful or Wanton Misconduct

{¶ 5} We begin our analysis with the appellants' second and third assignments of error, which state:

> II. THE TRIAL COURT ERRED IN FINDING THAT THE DEFENDANT APPELLEES ARE ENTITLED TO IMMUNITY.
>
> III. THE TRIAL COURT ERRED IN FINDING THAT INSUFFICIENT EVIDENCE HAS BEEN PRESENTED TO SUPPORT A CLAIM OF WILLFUL, WANTON, AND MALICIOUS MISCONDUCT.

{¶ 6} Relying on R.C. 2744.03, the appellants contend the record revealed a genuine issue of material fact as to whether the EMTs who transported Graves to the hospital acted willfully, wantonly, recklessly, or otherwise engaged in malicious misconduct and whether their actions deviated from the standard of care and proximately caused the decedent's death. Therefore, the appellants assert that the trial court

improperly entered summary judgment against them.

{¶ 7} Under Civ.R. 56(C), summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 8} "In a summary judgment review, the court may not weigh the proof or choose among reasonable inferences, and the court is limited to examining the evidence in the light most favorable to the non-moving party." *Coterel v. Reed*, 2016-Ohio-7411, ¶ 12 (2d Dist.), citing *Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 121 (1980). Significantly, however, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[B]ecause summary judgment is a procedural device to terminate litigation, it must be awarded with caution. Doubts must be resolved in favor of the non-moving party." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 359 (1992), citing *Osborne v. Lyles*, 63 Ohio St.3d 326, 333 (1992). Appellate review of summary judgment is de novo. *Gilliland v. Adams*, 2023-Ohio-3083, ¶ 24 (2d Dist.).

{¶ 9} With the foregoing standards in mind, we conclude that the trial court properly entered summary judgment for EMTs Kaufman and Scanlan and for the City of Springfield based on statutory immunity. With regard to the EMTs, the trial court correctly looked to R.C. 4765.49(A), which provides: "A first responder, emergency medical technician-basic,

emergency medical technician-intermediate, or emergency medical technician-paramedic is not liable in damages in a civil action for injury, death, or loss to person or property resulting from the individual's administration of emergency medical services, unless the services are administered in a manner that constitutes willful or wanton misconduct."

{¶ 10} With regard to the City of Springfield, R.C. 2744.02(A)(1) provides political-subdivision immunity for governmental functions, which include the provision of emergency medical services. *Riffle v. Physicians and Surgeons Ambulance Serv., Inc.*, 2013-Ohio-989, ¶ 15. An exception is found in R.C. 2744.02(B)(5), which applies "when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." In *Riffle*, the Ohio Supreme Court held that R.C. 4765.49(B) expressly imposed liability on a political subdivision under certain circumstances. *Id.* at ¶ 23. In particular, R.C. 4765.49(B) states that a political subdivision providing emergency medical services is not liable in damages in a civil action for injury, death, or loss" resulting from an EMT's actions "unless the services are provided in a manner that constitutes willful or wanton misconduct." Thus, where EMT services are provided in a manner that constitutes willful or wanton misconduct, R.C. 4765.49(B) expressly imposes liability on a political subdivision within the meaning of R.C. 2744.02(B)(5). *Riffle* at ¶ 23.

{¶ 11} Under R.C. 4765.49(A) and (B), then, appellees Kaufman, Scanlan, and the City of Springfield all were immune from liability unless the EMTs administered services to the decedent in a manner that constituted willful or wanton misconduct. After conducting a de novo review, we agree with the trial court's assessment that Kaufman

and Scanlan did not do so as a matter of law. Construing the evidence and all reasonable inferences in favor of the appellants, we see no genuine issue of material fact.

{¶ 12} "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 32. Willful misconduct effectively requires an intent to injure. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 375 (1998). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson* at ¶ 33.

{¶ 13} In the present case, EMTs Kaufman and Scanlan were called to Graves' residence where they found her in an upstairs bathroom. Family members reported that Graves had been experiencing vomiting and diarrhea. She was sweaty, incoherent, and unable to move her left side. The EMTs moved Graves outside and placed her on what they referred to as "a cot." The appellants' strongest evidence with regard to the EMTs' treatment of Graves from that point on came from Theresa Moore, a neighbor who watched from her kitchen window across the street. In her deposition, Moore described what she saw as follows:

> Well, it was when they were sitting there, she—it was like [Graves] had passed out, and it was like slow motion as she went off the side of the gurney. And I literally scared my kids to death because I was standing there going, oh, my God, catch her, catch her, catch her. And [Moore's children]

come flying like, what's going on? And that's when I seen her fall off that gurney. And that's—it was—there was no belt on her. If she would have had a belt on, she would have never fell off that gurney.

Moore depo. at 43.

{¶ 14} When asked whether Graves fell "all the way" to the ground, Moore responded that "there's no way she didn't." *Id.* at 48. Moore explained that she watched Graves fall from the side of the cot as one of the EMTs "was looking up in the air looking at the stars or something." *Id.* That EMT then grabbed Graves' feet and ankles, which were the only thing remaining on the cot. *Id.* From her vantage point, Moore did not actually see any part of Graves' body hit the ground. Given that only Graves' feet and ankles remained on the cot, however, Moore opined that "there's no way she didn't" hit the ground. *Id.* at 49. Based on the way Graves fell, Moore stated that it would have been the left side of her head that would have struck the ground. *Id.* at 50. Finally, Moore described what the EMT holding Graves' feet and ankles did after she fell off the side of the cot: "He just kind of looked—he kind of looked back at the house that sits straight across the street from mine, * * * he kind of looked back there, and I felt like he looked back there to see if anybody was watching. They never looked over toward my house." *Id.* at 51.

{¶ 15} Upon being transported to Springfield Regional Medical Center, Graves was diagnosed with a "subdural hematoma," or bleeding on the brain, on the left side of her head. In her deposition, Dr. Jenny Guest, the emergency-room physician, testified that Graves' symptoms inside the home before being moved by the EMTs were consistent

with a subdural hematoma. Guest depo. at 19. Guest observed no external signs of head trauma, which she typically would have expected to see if Graves had hit her head after falling from a cot. *Id.* at 23. Guest acknowledged, however, that external signs do not always accompany an internal head injury. *Id.* at 24. She also agreed that a blow to the head due to a fall from a cot could cause symptoms like those Graves was experiencing at the hospital. *Id.* at 22. Although the two EMTs did not report that Graves had fallen from a cot, Dr. Guest was aware of the allegation. The neighbor, Moore, had told Graves' mother about what she had seen, and Graves' mother had advised the doctor. *Id.* at 14.

{¶ 16} After receiving initial treatment at the hospital in Springfield, Graves was transported by helicopter to Miami Valley Hospital, where she died. Following an autopsy, a coroner identified the cause of death as an "acute *atraumatic* intracranial hemorrhage, contributed to by hypertensive cardiovascular disease and complications of chronic ethanol abuse." (Emphasis added.)

{¶ 17} For their part, Kaufman and Scanlan denied that Graves fell off of the cot. In their depositions, they described her "listing" to the side before they caught her, stopped her from going any further, and repositioned her. Kaufman depo. at 59; Scanlan depo. at 35. Both EMTs denied that Graves ever struck the ground. Kaufman depo. at 102; Scanlan depo. at 35. Both EMTs stated that they had strapped Graves to the cot with all the available straps (which only went to her torso) and that the cot's partial railing (which only went to her hips or waist) was up. Kaufman depo. at 60, 92; Scanlan depo. at 32. Although eyewitness Moore did not see any straps from her vantage point, the appellants concede on appeal that the two EMTs did secure Graves with two straps—"one around

her ankles, and the other around her midsection." Appellants' Brief at 8. They argue, however, that the EMTs should have used more effective restraints known as "Spider straps."

{¶ 18} Having reviewed the record, we see nothing from which a trier of fact reasonably could have found that Kaufman or Scanlon engaged in willful or wanton misconduct toward Graves. Construing the evidence and all reasonable inferences in favor of the appellants, a trier of fact reasonably could have inferred that Graves slid from the cot despite the lower portion of her body being strapped and did strike her head on the ground. While the appellees characterize such a conclusion as "speculation," we believe it is a fair inference that can be drawn from Moore's testimony. A trier of fact also could have inferred from Moore's testimony that the EMTs were not paying close enough attention when Graves slid from the cot. We see no basis, however, for finding that either EMT engaged in willful or wanton misconduct toward Graves. With regard to the appellants' argument about the use of "Spider straps," Kaufman acknowledged that they should be used "if available." Kaufman depo. at 26. But the cots his department used did not have them available. *Id.* at 26-28. For his part, Scanlan was not familiar with Spider straps. Scanlan depo. at 42.

{¶ 19} Even if we were to find the first-responder/EMT immunity statute, R.C. 4765.49(A), inapplicable to Kaufman and Scanlan (despite its clear applicability) and instead to apply the general immunity statute, R.C. 2744.03, summary judgment would have been proper. Under R.C. 2744.03(A)(6)(b), which covers all political-subdivision employees, an employee is immune unless he or she acted "with a malicious purpose, in

bad faith, or in a wanton or reckless manner."

{¶ 20} We fully addressed wanton misconduct in our analysis above. With regard to the other standards, "malicious purpose" means a willful and intentional design to injure. *Coterel v. Reed*, 2016-Ohio-7411, ¶ 16 (2d Dist.), quoting *Rondy v. Richland Newhope Indus., Inc.*, 2016-Ohio-118, ¶ 42 (5th Dist.). "Bad faith" suggests a dishonest purpose and conscious wrongdoing with ulterior motives or ill will. *Id.* We see no genuine issue of material fact as to whether Kaufman or Scanlan acted with a malicious purpose or in bad faith toward Graves. Nothing in the record supported such a conclusion.

{¶ 21} The only remaining standard under R.C. 2744.03(A)(6)(b) is "reckless" conduct. Such conduct "is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 34. Recklessness requires a showing that the actor knew his or her conduct "in all probability" would result in injury. *McDonald v. Lacy*, 2018-Ohio-2753, ¶ 26 (2d Dist.). Even showing recklessness is a "rigorous" threshold to meet. *Id.*

{¶ 22} We see nothing from which a trier of fact reasonably could have concluded that Kaufman or Scanlan acted recklessly. The appellants complain about Graves not being strapped above the waist, but nothing in the record suggests the availability of additional straps. We note too that the EMTs provided uncontroverted testimony about the cot's partial side rails being up. The appellants also complain about the EMTs not mentioning Graves' fall to the emergency-room physician after the fact. But the physician, Dr. Guest, promptly had been made aware of the allegation by Graves' mother. At most,

the record suggests that Kaufman and Scanlan were inattentive when Graves unexpectedly slid from her cot. As a matter of law, this conduct could not have constituted more than negligence.

{¶ 23} For all of the foregoing reasons, the trial court correctly entered summary judgment in favor of Kaufman, Scanlan, and the City of Springfield based on statutory immunity from liability. The appellants' second and third assignments of error are overruled.

### III. Other Issues

{¶ 24} The appellants' first, fourth, and fifth assignments of error state:

I. THE TRIAL COURT ERRED IN RULING THAT INSUFFICIENT EVIDENCE HAS BEEN ESTABLISHED TO REBUT THE CORONER'S CAUSE OF DEATH CONCLUSION.

IV. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE PLAINTIFF-APPELLANT'S MOTION FOR LEAVE TO FILE EXPERT DISCLOSURE.

V. THE TRIAL COURT ERRED IN FAILING TO ISSUE A DECISION REGARDING AND GRANT PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT.

{¶ 25} In their first assignment of error, the appellants contend the record contains evidence rebutting the coroner's determination that Graves died from an "atraumatic" subdural hematoma. The appellants contend a trier of fact reasonably could have found

that the fatal hematoma was caused by trauma, namely Graves' fall from the cot.

{¶ 26} In their fourth assignment of error, the appellants challenge the trial court's denial of their motion for leave to file expert disclosures to identify two medical doctors as their experts. The appellants claim these experts would have provided important testimony about the cause of Graves' death being a hematoma that resulted from her fall off of the cot.

{¶ 27} In their fifth assignment of error, the appellants contend the trial court erred in denying them leave to file a supplemental memorandum opposing summary judgment. The appellants explain that they desired to supplement their opposition with deposition testimony from the appellees' own medical expert regarding the cause of Graves' hematoma.

{¶ 28} In light of our statutory-immunity determination above, we find the appellants' first, fourth, and fifth assignments of error to be moot. Each of these assignments of error addresses the cause of Graves' hematoma and whether it resulted from her striking her head after falling from the cot. Even if we assume, however, that Graves fell from the cot, struck her head, and died from a subdural hematoma caused by the fall, the appellees would remain entitled to statutory immunity for the reasons set forth above. Nothing in the appellants' first, fourth, or fifth assignments of error has any bearing on whether the appellants engaged in conduct that would deprive them of immunity. Accordingly, we find those assignments of error to be moot and overrule them on that basis.

### IV. Conclusion

**{¶ 29}** The judgment of the Clark County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.